Hobart N. CROCKER, Jr., Appellant,

v.

PIEDMONT AVIATION, INC., Appellee.

Hobart N. CROCKER, Jr., Appellee,

v.

PIEDMONT AVIATION, INC., Appellant.

Nos. 93–7141, 93–7142.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 31, 1994.

Decided March 3, 1995.

As Amended March 3, 1995.

Rehearing and Suggestion for Rehearing
In Banc Denied April 19, 1995.

David M. Kirstein, Washington, DC, argued the cause for appellant. With him on the briefs was Robert M. Beckman, Washington, DC. Pierre E. Murphy, Washington, DC, entered an appearance for appellant.

Thomas E. Reinert, Jr., Washington, DC, argued the cause for appellee. With him on the brief was Neal D. Mollen, Washington, DC.

Before: WILLIAMS, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge.

When Congress deregulated the airline industry in the late 1970s, it sought to soften the blow to longtime airline employees who might lose their jobs in the expected industry shake-up. It therefore included in the deregulatory. legislation an Employee Protection Program ("EPP") for experienced airline workers who lost jobs or income as the result of a covered carrier's bankruptcy or downsizing. Airline Deregulation Act of 1978, Pub.L. No. 95-504, § 43, 92 Stat. 1750 (1978) (current version at 49 U.S.C. §§ 42101-06). Among other things, the EPP gives a furloughed or terminated employee with four years' experience as of October 1978 a "first right of hire, regardless of age, in his occupational specialty, by any other air carrier hiring additional employees...." Airline Deregulation Act § 43(d)(1); see also recodification at 49 U.S.C.A. § 42103 and hist. note (West 1994).[1] Airlines are under a corresponding "duty to hire such a person before

---

1. The 1994 recodification has changed this language somewhat, with no effect on substance. The provision now states that a "protected employee ... is entitled to be the first employed in the occupational specialty of the employee, regardless of the employee's age, by any other air carrier" covered by the Act. The language specifying the airline's corresponding duty to hire was deleted as surplusage. 49 U.S.C.A. § 42103 and hist. note (West 1994).

they hire any other person" besides their own laid-off employees. Airline Deregulation Act § 43(d)(1).

Hobart Crocker, Jr., a furloughed pilot protected by the EPP, sued Piedmont Aviation (now part of USAir, Inc.) for allegedly failing to hire him in violation of the Act. His complaint asked for instatement as a pilot and back pay. The district court denied Crocker's motion for a jury trial and, in a bench trial, found for Piedmont. We now hold that Crocker was entitled to a jury trial on his claims and that his failure to receive such a trial was prejudicial. In response to Piedmont's cross-appeal, we hold that the district court ruled correctly in finding Crocker's complaint to be timely filed under the District of Columbia's general three-year tort statute of limitations. We therefore remand the case for a jury trial.

## I.

Crocker was a pilot for Air New England from 1973 until he was furloughed when the carrier ceased operations in October 1981. In April 1982 he applied for a position as a pilot with Piedmont Aviation. Piedmont called Crocker and invited him to interview with the airline's pilot selection committee in July 1982. Crocker was then 56 years old.

At this point, Piedmont's and Crocker's stories diverge. Piedmont maintains that immediately after the meeting, it disqualified Crocker from further consideration based on his admission during the interview that the Federal Aviation Administration had temporarily suspended his pilot's license for violating safety rules. Crocker, on the other hand, alleges that Piedmont refused to hire him because of his age, notwithstanding the EPP's explicit prohibition on taking age into account.

In March 1984, Piedmont began hiring pilots who were not covered by the EPP's first-hire obligations. Crocker filed this action in June 1986, alleging that the hiring of these unprotected candidates violated his priority under the EPP; he asked for instatement as a pilot and back pay and demanded a jury trial. Piedmont moved for summary judgment in 1988 on the grounds that the suit

was untimely filed; as discussed in greater detail below, the district court denied the motion. 696 F.Supp. 685, 689–92 (D.D.C. 1988). Piedmont filed a second motion for summary judgment (technically, a motion to strike part of the plaintiff's claim for relief) in 1989, contending that Crocker lost his EPP rights when he took temporary employment with a non-certificated, bankrupt air taxi service while awaiting a decision from Piedmont. The district court granted the motion. 741 F.Supp. 241 (D.D.C.1989). Crocker appealed, and we reversed and remanded for trial. *Crocker v. Piedmont Aviation, Inc.,* 933 F.2d 1024 (D.C.Cir.1991).

Roughly a week before jury selection was to begin, the district court granted Piedmont's motion to strike Crocker's jury demand on the grounds that the claims for back pay and instatement were both equitable in nature; hence, the Seventh Amendment's guarantee of a jury trial for all "Suits at common law, where the value in controversy shall exceed twenty dollars" did not apply. After a two-day bench trial, the court found that Piedmont had a policy of never hiring pilots whose flying licenses had been suspended by the FAA, that this hiring standard was a legitimate non-age-based requirement of employment, and that Piedmont had refused to hire Crocker because he failed to meet this standard. The court entered judgment for Piedmont.

Crocker now appeals both the order striking his jury demand and the order entering judgment for Piedmont. Piedmont cross-appeals the district court's 1988 decision applying a three-year statute of limitations to the claims and denying summary judgment. We address the statute of limitations issues first.

## II.

### A. *Waiver and Law of the Case*

Piedmont urges us to affirm the judgment entered in its favor, regardless of how we rule on the Seventh Amendment question, because the suit was filed out of time. The airline maintains that a six-month statute of limitations borrowed from the National Labor Relations Act governs the cause of action and bars this suit, which was filed 27 months

after the claim accrued in March 1984. Piedmont initially raised this argument before the trial court in its 1988 motion for summary judgment. The district court denied this motion, holding that the District of Columbia's general three-year tort statute of limitations provided the relevant period and that Crocker's suit was thus timely filed. When this case came to us on Crocker's appeal in 1991, however, Piedmont did not challenge this earlier statute of limitations ruling or present it as a possible alternative basis for affirming its award of summary judgment.

Crocker maintains that by this failure to present the issue to us in 1991, Piedmont has forfeited the possibility of raising a statute of limitations argument on this appeal. He argues that the district court's 1988 limitations ruling has become the binding law of the case, which we may not revisit. We reject Crocker's position and decide the limitations issue.

■ "Law-of-the-case doctrine" refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided (i.e., established as the law of the case) by that court or a higher one in earlier phases. When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court. See, e.g., *Northwestern Ind. Tel. Co. v. FCC,* 872 F.2d 465, 471 (D.C.Cir.1989) (appellate court's prior ruling establishing exhaustion requirement is law of the case and cannot be challenged on second appeal); *Laffey v. Northwest Airlines, Inc.,* 740 F.2d 1071, 1090, 1093 (D.C.Cir.1984) (challenge to district court's correct application of prior appellate decision is barred by law-of-the-case doctrine); see also 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478, at 801 (1981); *id.* at 625 (1994 Supp.) ("Arguments that were not advanced on appeal may be lost because they are found wrapped up with a larger issue that was decided" previously). What identifies this as true law-of-the-case preclusion is that the first appeals court has affirmatively decided the issue, be

it explicitly or by necessary implication. See *Women's Equity Action League v. Cavazos,* 906 F.2d 742, 751 n. 14 (D.C.Cir.1990) ("Questions that merely could have been decided do not become law of the case") (citing *Bouchet v. National Urban League,* 730 F.2d 799, 806 (D.C.Cir.1984)).

Previous decisions of this court have extended these principles beyond their core application. We have several times said that appellate courts are precluded from revisiting not just prior *appellate* decisions but also those prior rulings of the *trial* court that could have been but were not challenged on an earlier appeal. "[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, [governs] future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time," *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C.Cir.1987). See also *Palmer v. Kelly,* 17 F.3d 1490, 1495–96 (D.C.Cir.1994); *Laffey,* 740 F.2d at 1089–90 (defendant's failure to challenge district court's formula for calculation of damages on first appeal waives any potential challenge on later appeals). Although we have often referred to this second principle as a type of law-of-the-case rule (in part because the two principles were first articulated in this circuit alongside one another, see *Laffey,* 740 F.2d at 1089–93), it is an analytically distinct principle: unlike law-of-the-case doctrine proper, this bar on raising issues omitted from prior appeals—best understood as a species of waiver doctrine—does *not* involve any previous appellate court decision on the barred issue. Our occasional shorthand suggestion that the trial court's decision becomes "law of the case" for the appellate court is technically inaccurate. Cf. *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 817–18, 108 S.Ct. 2166, 2178–79, 100 L.Ed.2d 811 (1988) ("[A] district court's adherence to law of the case cannot insulate an issue from appellate review").

■ In any event, neither law-of-the-case doctrine proper nor this subsidiary waiver principle is an absolute preclusion to appellate review. Law of the case is a pru-

dential rule rather than a jurisdictional one; in the words of Justice Holmes, the doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power," *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). See also *Christianson*, 486 U.S. at 817, 108 S.Ct. at 2178; *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) ("Law of the case directs a court's discretion[;] it does not limit the tribunal's power."); *Women's Equity Action League*, 906 F.2d at 751–52 n. 14. The derivative waiver rule is justified by a similar practical concern for judicial economy, as it channels into the first appeal issues whose early resolution might obviate the need for later rounds of remands and appeals. See *Laffey*, 740 F.2d at 1089 (waiver rule flows from need for "orderly conduct of litigation"). But the concerns for judicial economy underlying this waiver rule are plainly weaker than for core law-of-the-case doctrine; the waiver rule is never needed to prevent the appellate court from revisiting matters it has already decided once.

    ■  For both core law-of-the-case preclusion and its diluted waiver variant, the bases for exceptions are broader than for conventional issue or claim preclusion. While final judgments normally may not be re-examined merely because of an intervening change in the law, see, e.g., 18 Wright, Miller & Cooper § 4415, at 130–31; see also *id.*, § 4426 at 268 (suggesting that similar principles govern issue preclusion), such a change *will* support a departure from the previously established law of the case. See *Women's Equity Action League*, 906 F.2d at 752 n. 14 ("When intervening legal authority makes clear that a prior decision bears qualification, that decision must yield. Law of the case cannot be substituted for the law of the land.") (internal quotation marks omitted). Similarly, an appellate court may deviate from the law of the case if the previous decision was "*clearly* erroneous and would work a *manifest* injustice," *Arizona v. California*, 460 U.S. at 618 n. 8, 103 S.Ct. at 1391 n. 8 (emphasis added), which would not justi-

fy overturning a final judgment. The preclusive barrier of the waiver doctrine is even one notch weaker: the appellate court, for example, always possesses discretion to reach an otherwise waived issue logically "antecedent to and ultimately dispositive of the dispute before it," *United States Nat'l Bank of Oregon v. Independent Ins. Agents of America*, —— U.S. ——, ——, 113 S.Ct. 2173, 2178, 124 L.Ed.2d 402 (1993) (ellipses and internal quotation marks omitted), although discretion to waive a waiver is normally exercised only in "exceptional circumstances, where injustice might otherwise result," *Eli Lilly & Co. v. Home Ins. Co.*, 794 F.2d 710, 717 (D.C.Cir.1986).

    ■  The present case involves an application of waiver doctrine, not core law-of-the-case principles. It is true, as Crocker notes, that had Piedmont presented its statute of limitations argument to us in 1991 when we reviewed the earlier grant of summary judgment, three years of additional litigation could potentially have been avoided: a finding that Crocker's suit was time-barred would have obviated the need for any kind of trial, whether by court or jury. But Piedmont's role as an appellee introduces other concerns. Crocker, not Piedmont, defined the battleground on the first appeal, raising issues having nothing whatever to do with the statute of limitations. While there are clear adjudicative efficiencies created by requiring appellants to bring all of their objections to a judgment in a single appeal rather than *seriatim* (the *only* context in which we have ever before now applied the waiver doctrine), forcing appellees to put forth every conceivable alternative ground for affirmance might increase the complexity and scope of appeals more than it would streamline the progress of the litigation. While an appellant must persuade the court to overturn a district court ruling, it enjoys the offsetting procedural benefit of filing both the opening and reply briefs. On the other hand, an appellee presenting alternative grounds for affirmance and facing a potential application of the waiver doctrine must also attack an adverse district court ruling,[2] but without the

---

2. The waiver rule we have been discussing ap-

plies only when the trial court has expressly or

offsetting advantage of being able to file a reply brief.

■ Of course, an appellee might respond to this procedural handicap by filing a cross-appeal, as Piedmont did on this round of appeals. But this imposes significant burdens on the appellate court. Cross-appeals are required only when the party prevailing below seeks to enlarge the scope of that judgment; they are not necessary when the party simply presents alternative bases for affirmance. See *United States v. American Ry. Express,* 265 U.S. 425, 435, 44 S.Ct. 560, 563–64, 68 L.Ed. 1087 (1924); *Koniag, Inc. v. Andrus,* 580 F.2d 601, 605 n. 3 (D.C.Cir. 1978). These unnecessary cross-appeals may alleviate the procedural asymmetry faced by the appellee, but they generate additional complexity that has elicited sharp judicial rebuke:

> Cross-appeals for the sole purpose of making an argument in support of the judgment are worse than unnecessary. They disrupt the briefing schedule, increasing from three to four the number of briefs, and they make the case less readily understandable to the judges. The arguments will be distributed over more papers, which also tend to be longer. Unless a party requests the alteration of the judgment in its favor, it should not file a notice of appeal.

*Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 439 (7th Cir.1987). See also 15A Wright, Miller & Cooper § 3904, at 205 ("Cross-appeal procedure complicates briefing schedules and the number and length of briefs in ways that may generate more confusion than enlightenment").

Thus, full application of the waiver rule to an appellee puts it in a dilemma between procedural disadvantage and improper use of the cross-appeal. That dilemma, together with the potential judicial *dis*economies of forcing appellees to multiply the number of arguments presented, justifies a degree of leniency in applying the waiver rule to issues that could have been raised by appellees on previous appeals.

Finally, any doubts that we might have here about the propriety of reaching the limitations issues are allayed by the fact that deciding Piedmont's proffered narrow question of statutory interpretation offers us the potential (at least when viewed *ex ante* ) of resolving the case without making pronouncements on the complex Seventh Amendment questions. Cf. *Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (counseling against reaching constitutional questions when potentially adequate non-constitutional grounds for decision exist); *Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806, 810 (D.C.Cir.1993) (same). We therefore turn to the merits of Piedmont's arguments.

### B. *Statute of Limitations*

■ The EPP does not explicitly create a private cause of action for protected employees whose first-hire rights have been violated; rather, courts have inferred such a right of action from the structure of the statutory scheme and the policies it is designed to further. See generally *Long v. Trans World Airlines, Inc.,* 913 F.2d 1262, 1265–67 (7th Cir.1990). Obviously, Congress did not specify a statute of limitations to govern a cause of action it did not consciously create. As a result, we must "discern[ ] the limitations period that Congress intended courts to apply to a cause of action it really never knew existed." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 359, 111 S.Ct. 2773, 2780, 115 L.Ed.2d 321 (1991).

The district court held that the most appropriate statute of limitations to borrow was the District of Columbia's general three-year period applicable to tort claims not otherwise specified, *D.C.Code* § 12–301(8); hence, the suit—filed 27 months after the cause of action accrued—was saved. Piedmont, on the other hand, argues that the most analogous statutes of limitation are federal: the six-month period for filing unfair labor practice complaints under the National Labor Rela-

---

impliedly ruled on a question and there has been an opportunity to challenge that ruling on a prior appeal. See *Williamsburg Wax Museum,* 810

F.2d at 250. If the trial court has not affirmatively ruled, the waiver doctrine would be inapplicable.

tions Act, 29 U.S.C. § 160(b), or the maximum 300–day limitations period for filing a complaint with the Equal Employment Opportunity Commission under the Age Discrimination in Employment Act, 29 U.S.C. § 626(d)(2). Should we find no federal statute of limitations appropriate, Piedmont contends, the one-year time limit for bringing an age-discrimination suit under the District of Columbia's Human Rights Act, *D.C.Code* § 1–2544, should govern. Under any of Piedmont's theories, Crocker's suit would be time-barred.

Federal courts usually look to state law for an analogous statute of limitations. This represents long-standing judicial practice under the Rules of Decision Act and a presumed congressional endorsement of that practice. See *Lampf, Pleva,* 501 U.S. at 355–56, 111 S.Ct. at 2778 (plurality opinion); *Reed v. United Transp. Union,* 488 U.S. 319, 323–24, 109 S.Ct. 621, 624–25, 102 L.Ed.2d 665 (1989); *Agency Holding Corp. v. Malley–Duff & Associates,* 483 U.S. 143, 147, 107 S.Ct. 2759, 2762–63, 97 L.Ed.2d 121 (1987). On the other hand, the importation of state law in some instances would interfere with federal policy, and it would be "inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law," *DelCostello v. International Bhd. of Teamsters,* 462 U.S. 151, 161, 103 S.Ct. 2281, 2289, 76 L.Ed.2d 476 (1983). In those cases, we look for a statute of limitations in federal law. See *DelCostello; Agency Holding Corp.* Still, our borrowing from federal law is "unusual" and "a closely circumscribed exception to the general rule," *Reed,* 488 U.S. at 324, 109 S.Ct. at 625; we will do it "only 'when a rule from elsewhere in federal law *clearly* provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a *significantly* more appropriate vehicle for interstitial lawmaking,'" *id.* (quoting *DelCostello,* 462 U.S. at 172, 103 S.Ct. at 2294–95) (emphasis added).

We must therefore find two things before we look to federal law for a limitations period: a federal policy that would clearly be frustrated by using state statutes of limitation, and a closely analogous federal statute. As to the first, Piedmont posits a strong federal interest in inter-jurisdictional uniformity in the administration of the EPP, given that the airline industry is overwhelmingly interstate. It is true that in *Agency Holding Corp.* the Court observed that a single civil RICO suit could potentially encompass an enormous range of state-law claims in multiple jurisdictions simultaneously and accordingly found a single, uniform federal limitations period for these suits. See 483 U.S. at 153–54, 107 S.Ct. at 2765–66. On the other hand, the mere possibility that an actor with operations in more than one state might be subject to different statutes of limitation for the same conduct in different jurisdictions cannot itself be enough to force a uniform period: such is the result *any* time a federal court borrows a local statute of limitations, yet the norm is to look to state law. See *Wilson v. Garcia,* 471 U.S. 261, 275, 105 S.Ct. 1938, 1946–47, 85 L.Ed.2d 254 (1985) (requiring that all kinds of § 1983 actions be classified as personal injury suits for purposes of seeking analogous state causes of action, but recognizing that use of state analogy will cause interstate variation).

The EPP lawsuits at issue here fall midway along this spectrum. On the one hand, although there is some potential factual variation among first-hire claims (as we discuss below), it is not so great as for the hydra-headed civil RICO actions considered above. On the other hand, given that all (or at least virtually all) of the regulated airlines subject to the EPP would have operations in more than one state, the statute by its terms assures that a high proportion of cases and defendants will be subject to diverse limitations periods. As the Court appeared to regard civil RICO as a truly exceptional case, we think this intermediate position cannot automatically justify insistence on a uniform federal period; we regard it only as a factor to be kept in mind as we search for federal statutory analogs.

Neither of the federal statutes put forth by Piedmont—the National Labor Relations Act and the Age Discrimination in Employment Act—is sufficiently similar to the EPP to turn us away from the usual practice of

borrowing from state law. The Supreme Court has regarded the NLRA's uniform six-month limitations period for filing unfair labor practice charges with the National Labor Relations Board as especially necessary to support "those consensual processes that federal labor law is chiefly designed to promote—the formation of the collective agreement and the private settlement of disputes under it," *DelCostello*, 462 U.S. at 163, 103 S.Ct. at 2289 (citation omitted). See also *Reed*, 488 U.S. at 333, 109 S.Ct. at 630 (stressing that purpose of six-months limit is to sustain special "federal interests in stable bargaining relationships and in private dispute resolution"). Thus the Court has extended the NLRA's six-month period to hybrid suits combining Labor Management Relations Act § 301 claims against an employer for breach of a collective bargaining agreement with NLRA claims against a union for breach of its duty of fair representation in the agreement-created grievance process. *DelCostello*. But the Court has not applied this period to all labor-law actions: it refused to apply it to a suit to enforce union democracy rights created by § 101 of the Labor-Management Reporting and Disclosure Act even though the resolution of the suit could have had "some impact on economic relations between union and employer and on labor peace." *Reed*, 488 U.S. at 331, 109 S.Ct. at 629.

The EPP's connection to NLRA unfair labor practice adjudication is quite remote. The EPP provides special hiring rights regardless of whether the protected worker's past or potential employers are covered by any collective bargaining agreement or other federally promoted relationship. Any effect that a successful EPP suit might have on a collective bargaining agreement is indirect and contingent: should a court order the instatement of an employee denied first-hire rights, that employee's carryover seniority rights could conceivably disrupt a pre-existing seniority agreement between the new employer and a union, should one exist. Because the relationship is somewhat remote, the majority of circuit courts that have considered the question have decided against applying the NLRA's six-month limitation to litigants' first-hire claims under the EPP.

See *Bowdry v. United Air Lines, Inc.*, 956 F.2d 999, 1004–07 (10th Cir.1992) (rejecting NLRA time limit in favor of state-law period for suits on federal claims not otherwise specified); *Gonzalez v. Aloha Airlines*, 940 F.2d 1312, 1314–15 (9th Cir.1991) (same); *McDonald v. Piedmont Aviation, Inc.*, 930 F.2d 220, 224–25 (2d Cir.1991) (rejecting NLRA period in favor of three-year state tort statute of limitations); but see *Haggerty v. USAir, Inc.*, 952 F.2d 781, 786–88 (3d Cir.1992) (borrowing NLRA's six-month limitations period for EPP claims). We do the same.

Piedmont alternatively suggests that we treat Crocker's suit as an age discrimination case and apply the maximum 300-day time limit for filing such claims with the EEOC under the federal Age Discrimination in Employment Act ("ADEA"). It is true that the plaintiff here has suggested that his EPP rights were ignored because of his age, and it is also true that the text of the EPP explicitly gives protected employees rights of first hire "regardless of age." But age discrimination is in no way an essential component of an EPP suit; protected workers who meet a carrier's established hiring qualifications, see 29 CFR § 220.11(a), may have a cause of action if their first-hire rights are ignored for *any* reason, age simply being an explicitly listed example. See, e.g., *Bowdry*, 956 F.2d at 1001–04 (airline violated EPP by refusing to hire workers who had rejected alternative opportunity for employment by another carrier); *Long*, 913 F.2d at 1267–69 (airline violated EPP by denying first-hire rights to employees it had replaced in an economic strike). To make the choice of limitations period turn on the particular facts or theory of each claim would clearly "breed[ ] uncertainty and time-consuming litigation," *Wilson v. Garcia*, 471 U.S. at 272, 105 S.Ct. at 1945; we must therefore pick a single period fitted as well as possible to the EPP as a generic cause of action. The ADEA's limitations period does not qualify.

In short, we find no obvious federal statutory analog to the EPP cause of action and only a moderate federal policy interest in uniformity that would be frustrated by borrowing state law. We therefore look for an

appropriate statute of limitations in the law of the District of Columbia. Piedmont, on substantially the same grounds it invoked for use of the ADEA, urges us to adopt the one-year limitations period for bringing claims under the D.C.Human Rights Act. See *D.C.Code* § 1–2544(a) (one-year limit for filing administrative claims with Office of Human Rights); *Davis v. Potomac Elec. Power Co.*, 449 A.2d 278 (D.C.1982) (applying this one-year period to suits filed under the Act). That statute makes it unlawful to fail to hire an individual "wholly or partially for a discriminatory reason based upon [the person's] race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation." *D.C.Code* § 1–2512(a) and (a)(1). Though the D.C.Human Rights Act covers a broader range of employment discrimination claims than does the federal ADEA, it is not on that account more suitable. Again, the EPP is not a ban on discrimination but an explicit requirement of preference on the basis of a single characteristic; proof of discrimination on any of the bases enumerated in the D.C.Human Rights Act is neither necessary nor sufficient for a successful EPP first-hire claim. A plaintiff may, as a matter of trial strategy, try to prove that discrimination motivated the defendant's refusal to recognize his or her first-hire rights in a particular case, but any resulting similarity between EPP litigation and anti-discrimination claims is fortuitous.

At oral argument, it was suggested that we apply the District of Columbia's one-year statute of limitations for "libel, slander, assault, battery, mayhem, wounding, malicious prosecution, false arrest or false imprisonment," *D.C.Code* § 12–301(4), on the theory that a defendant's violation of its first-hire duties under the EPP constitutes an intentional tort similar to those in the statute. Cf. *Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1114–15, 1115 n. 30 (D.C.Cir.1985) (applying § 12–301(4)'s one-year period to *Bivens* action based on alleged defamation); *McClam v. Barry*, 697 F.2d 366, 372–74 (D.C.Cir.1983) (applying § 12–301(4) to *Bivens* claim alleging false imprisonment). But the District of Columbia courts have made it clear that

§ 12–301(4)'s one-year limitations period governs only the specific enumerated torts; it does not apply generically to all intentional torts. See *Saunders v. Nemati*, 580 A.2d 660, 663–64 (D.C.1990). Significantly for our case, § 12–301(4) does not cover intentional *economic* torts such as tortious interference with contract or fraud. See *id.* In *Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1427 (D.C.Cir.1986), we said in dictum that § 12–301(4) should not apply to a claim under 42 U.S.C. § 1981, as that section's guarantees of "equal rights to make and enforce contracts, equal access to judicial process, and equal rights under law" made it quite different from the physical and reputational torts covered by § 12–301(4), *id.* at 1428. The distinction is applicable here, and it seems compelling.

Having considered and rejected every other possibility proposed, we are left with the district court's choice: the local three-year period that governs all causes of action "for which a limitation is not otherwise specially prescribed," *D.C.Code* § 12–301(8). While it is easy to disparage this statute (as Piedmont does) as a mere catch-all or residual category, it does in fact embrace all personal injury claims in the District of Columbia (other than the few intentional physical and reputational torts covered by § 12–301(4), see *Banks*, 802 F.2d at 1426–27), including the economic torts of fraud and tortious interference, see *Saunders*, 580 A.2d at 663–64. Though its fit is not perfect, this statute appears closest to our generic cause of action. Cf. *DelCostello*, 462 U.S. at 171, 103 S.Ct. at 2294 (stating that selection of state law is the norm even where it fails to provide a "perfect analogy").

We therefore agree with the district court that the general three-year statute of limitations in § 12–301(8) governs this suit for violation of EPP first-hire rights. Because Crocker filed his complaint nine months before this period ran, his suit was timely. As a result, we must proceed to address Crocker's possible right to a jury trial.

### III.

The Seventh Amendment provides that "[i]n Suits at common law, where the

value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." Crocker's suit asked for instatement with Piedmont as a pilot and back pay from the date his claim accrued. Both parties agree that instatement is an equitable remedy, not a legal one; Crocker concedes that if he had sought only instatement, his suit could be tried without a jury. The question, then, is whether the Constitution requires a jury trial of Crocker's claim for back pay.

■ The Supreme Court has established a two-step inquiry for determining when a litigant has a right to have his or her claims under a statute heard by a jury:

> To determine whether a particular action will resolve legal rights, and therefore give rise to a jury trial right, we examine both the nature of the issues involved and the remedy sought. First, we compare the statutory action to 18th–century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature.

*Wooddell v. International Bhd. of Elec. Workers,* 502 U.S. 93, 97, 112 S.Ct. 494, 497, 116 L.Ed.2d 419 (1991) (citations and internal quotation marks omitted). For reasons that will become apparent in the next section, the second part of this test (the nature of the remedy) is more important than the first. See *id.* 502 U.S. at 97, 112 S.Ct. at 498; *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42, 109 S.Ct. 2782, 2790, 106 L.Ed.2d 26 (1989). We take each part of this inquiry in turn.

A. *Analogies to 18th–Century English Practice*

Where the right at issue is a creature of recent statute, the search for an 18th–century English analog typically yields no clear answer. Given the radical difference between mid–20th–century American ideas of the proper role of the state and the ideas prevailing in 18th–century England, this difficulty is hardly surprising; it is certainly present here. Moreover, as the focus of the inquiry is on whether the *"issue to be tried"*

was analogous to one characteristically dealt with in equity or at common law, *Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry,* 494 U.S. 558, 569, 110 S.Ct. 1339, 1347, 108 L.Ed.2d 519 (1990) (emphasis in original), and as most traditional issues could be tried in both contexts (albeit leading to different remedies), inconclusive results seem foreordained.

Piedmont, recalling the efforts of William Marbury to secure his commission as justice of the peace, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), suggests that Crocker's suit for instatement is analogous to a request for a writ of mandamus, which it characterizes as equitable. Technically, this characterization is incorrect: writs of mandamus, like the other prerogative writs, were primarily issued by the King's Bench, a court of common law and not equity. See 1 William Holdsworth, *A History of English Law* 229 (6th ed. 1938); see also *Heine v. The Levee Comm'rs,* 86 U.S. (19 Wall.) 655, 660, 22 L.Ed. 223 (1873) ("Mandamus is essentially and exclusively a common-law remedy and is unknown to the equity practice"). The point is probably immaterial, however, for an action in mandamus was never tried by a jury.

The more serious difficulty is that Crocker's claim is not closely analogous to a petition for a writ of mandamus. The King's Bench issued such writs as part of its exercise of the royal powers of administration; they were "directed to any person, corporation, or inferior court of judicature within the king's dominions, requiring them to do some particular thing therein specified, *which appertains to their office and duty."* 3 William Blackstone, *Commentaries* *110 (emphasis changed). But so far as appears, the writ served only for ordering *public* officials to perform clear ministerial duties, and officials of corporations were deemed public only by virtue of their organizations' royal charters. While a writ of mandamus might therefore lie "to compel the admission or restoration of the party applying to any office or franchise *of a public nature,* whether spiritual or temporal," *id.* (emphasis added), we can find no evidence of its application in the 18th century to purely private employment below the level

of corporate official, the scenario relevant to Crocker's claim.

Crocker, on the other hand, suggests that Piedmont's alleged failure to hire him in disregard of the EPP's statutory command is analogous to the tort of wrongful discharge—or more precisely, to the public policy exceptions to the employment-at-will doctrine, which may prevent the firing of employees who exercise statutory rights (e.g., applying for workers' compensation) or fulfill statutory duties (e.g., jury duty or reporting fraud). Whether or not this analogy is apt, it fails for our purposes because the tort of wrongful discharge is a creature of the twentieth century, not the eighteenth. The first significant statutory abridgment of the employment-at-will doctrine was the National Labor Relations Act, and cases recognizing a wrongful discharge tort grounded in public policy did not arise until the 1950s. See Timothy J. Heinsz, The Assault on the Employment at Will Doctrine: Management Considerations, 48 Mo.L.Rev. 855, 873–77 (1983); Brian F. Berger, Note, Defining Public Policy Torts in At–Will Dismissals, 34 Stan.L.Rev. 153, 155–58 (1981).

Crocker also highlights the age discrimination aspects of his claim and suggests analogies to traditional tort actions for personal injuries, noting that the Supreme Court has drawn similar analogies for certain discrimination claims. See, e.g., Curtis v. Loether, 415 U.S. 189, 195–96 n. 10, 94 S.Ct. 1005, 1009 n. 10, 39 L.Ed.2d 260 (1974) ("An action to redress racial discrimination may also be likened to an action for defamation or intentional infliction of mental distress."); see also Goodman v. Lukens Steel Co., 482 U.S. 656, 661, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987) (analogizing 42 U.S.C. § 1981 claims to personal injury claims for purposes of determining statute of limitations); Wilson, 471 U.S. at 277–78, 105 S.Ct. at 1947–48 (same for § 1983). But as we have now said twice, the age discrimination aspects of this case are legally peripheral, and an EPP first-hire action is not, at its core, an antidiscrimination suit.

In one final attempt to fit his case into a traditional tort-law paradigm, Crocker reframes it as follows: as in any other personal injury action, the law (here, the EPP) imposed a duty of care on Piedmont towards people in Crocker's situation, Piedmont breached that duty, the breach injured Crocker, and Crocker suffered damages. But while it is true that courts have long looked to statutes for the applicable standard of care in tort actions, see, e.g., 3 Fowler V. Harper et al., The Law of Torts § 17.6 (2d ed. 1986), Crocker's argument is at far too high a level of generality to control. It would allow any lawsuit alleging some violation of the law to be bootstrapped into a personal injury paradigm simply by reframing the alleged legal violation as a breach of a duty of care.

We are therefore left—to borrow the Supreme Court's term for the outcome of a similarly futile historical inquiry—"in equipoise." Terry, 494 U.S. at 570, 110 S.Ct. at 1347. Of course, the lack of a closely analogous cause of action does not automatically mean, as Piedmont suggests, that Crocker has no right to a jury trial, given that "the right extends beyond the common-law forms of action recognized" in 1791, Curtis, 415 U.S. at 193, 94 S.Ct. at 1007–08. Rather, we proceed to the second and more important step of the Seventh Amendment inquiry: the characterization of the remedies the plaintiff is seeking as either legal or equitable.

B. *The Nature of the EPP Backpay Remedy*

The Supreme Court has held that as a general rule awards of pecuniary relief such as back pay are legal. See Mertens v. Hewitt Assocs., —— U.S. ——, ——, 113 S.Ct. 2063, 2068, 124 L.Ed.2d 161 (1993); Terry, 494 U.S. at 570, 110 S.Ct. at 1347–48; Curtis, 415 U.S. at 196, 94 S.Ct. at 1009. This is not so in every case, however; courts of equity have long had the power to give pecuniary relief should specific performance or other traditionally equitable remedies be insufficient. See Mertens, —— U.S. at —— - ——, 113 S.Ct. at 2068–69; see also Arthur G. Sedgwick & Joseph H. Beale, A Treatise on the Measure of Damages § 1256b (9th Ed.1920). In Teamsters v. Terry, the Court articulated two exceptions to the general rule

that back pay or other monetary relief is legal and entitles the plaintiff to a jury trial:

> First, we have characterized damages as equitable where they are restitutionary, such as in "action[s] for disgorgement of improper profits," *Tull* [*v. United States* ], 481 U.S. [412,] 424 [107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987) ]. See also *Curtis v. Loether, supra,* [415 U.S.] at 197 [94 S.Ct. at 1010;] *Porter v. Warner Holding Co.,* 328 U.S. 395, 402 [66 S.Ct. 1086, 1091, 90 L.Ed. 1332] (1946).... Second, a monetary award "incidental to or intertwined with injunctive relief" may be equitable. *Tull, supra,* [481 U.S.] at 424 [107 S.Ct. at 1839.] See, e.g., *Mitchell v. Robert De-Mario Jewelry, Inc.,* 361 U.S. 288, 291–92 [80 S.Ct. 332, 334–35, 4 L.Ed.2d 323] (1960)....

494 U.S. at 570–71, 110 S.Ct. at 1347–48. If the monetary relief requested possesses neither of these attributes, the remedy is considered legal, and the plaintiff is entitled to a jury trial on his or her complaint. *Id.* at 570, 110 S.Ct. at 1347–48.

The first element of this test turns on the definition of "restitutionary." "Restitution [is] defined as that body of law in which (1) substantive liability is based on unjust enrichment, (2) the measure of recovery is based on defendant's gain instead of plaintiff's loss, *or* (3) the court restores to plaintiff, in kind, his lost property or its proceeds." Douglas Laycock, The Scope and Significance of Restitution, 67 Tex.L.Rev. 1277, 1293 (1989) (emphasis in original). An action in restitution *can* result in the defendant's payment of money, either because that sum of money was itself the thing unjustly taken or because the thing taken has been converted and can no longer be specifically returned. See, e.g., *Porter v. Warner Holding Co.,* 328 U.S. 395, 402, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332 (1946). In such a case the payment of money from defendant to plaintiff represents a kind of specific relief rather than compensatory damages.

Whatever restitution may encompass, however, we clearly may not collapse it into the broader notion of "compensation." Cf. Laycock, *supra,* at 1282–83. Yet it is hard to see

how back pay could generally be characterized as restitutionary without having that effect. Two characteristics tend to make Crocker's requested back pay more like compensatory damages than specific relief. First, his recovery would not be measured by any hypothetical gain Piedmont had enjoyed, even if such a gain were measurable, which it is not. Second, as we noted in *Hubbard v. Administrator, EPA,* 982 F.2d 531, 533–34 (D.C.Cir.1992) (en banc), income from alternative employment is deducted from the gross unpaid income, precisely so that the plaintiff will be compensated solely for his actual losses. Crocker's claim for back pay is thus not restitutionary. Cf. *Waldrop v. Southern Co. Svcs., Inc.,* 24 F.3d 152, 158–59 (11th Cir.1994) (back pay award under § 504 of Rehabilitation Act represents compensatory damages, not restitution).

The second prong of the *Terry* test holds that monetary damages "incidental to or intertwined with injunctive relief" may be considered equitable for Seventh Amendment purposes. Piedmont argues that Crocker's claims for back pay and instatement (a form of injunctive relief) are intertwined simply because they were brought together in the same complaint. *Terry* provides some support for the idea that the relevant "intertwining" is found in the plaintiff's request for remedies; in that case all the claims for injunctive relief had dropped out by the time of appeal, and the Court noted tersely that "[b]ecause respondents seek only money damages, this characteristic is clearly absent from the case." 494 U.S. at 571, 110 S.Ct. at 1348. But where all claims for legal and equitable relief are still live, the Court in fact seems not to look to the plaintiff's demand for indicia of intertwining. The plaintiff in *Wooddell* sued his union under the LMRDA for discrimination in job referrals and requested both back pay and injunctive relief in a single complaint. The *Wooddell* Court required a jury trial on the backpay claims notwithstanding the fact that both types of claims were live at the time of the appeal. 502 U.S. at 97–99, 112 S.Ct. at 498.

Nor do we think that the term can, as both parties suggest,[3] refer to the relative worth of the back pay and equitable claims at a particular point in the litigation. The Court has repeatedly and firmly insisted that the right to jury trial on a legal claim cannot be extinguished simply because modern procedural devices have brought it together in the same suit as an equitable claim. See *Ross v. Bernhard,* 396 U.S. 531, 537–38, 90 S.Ct. 733, 737–38, 24 L.Ed.2d 729 (1970); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 470, 82 S.Ct. 894, 896, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). And *Dairy Queen*'s disparagement of the idea that the jury right could be "lost as to legal issues where those issues are characterized as 'incidental' to equitable issues," 369 U.S. at 470, 82 S.Ct. at 896, would sit awkwardly with any such quantitative comparison. But cf. *Tull v. United States,* 481 U.S. 412, 424–25, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987) (characterizing civil penalty as legal and noting that its amount, $22 million, "hardly [could] be considered incidental to the modest equitable relief sought in this case").

It appears instead that the status of a claim as "intertwined" or "incidental" with injunctive relief depends on the remedial structure of the statutory scheme. The Supreme Court has characterized lost-wage and backpay remedies as equitable when the power to award such amounts was derived from a statutory grant of equitable authority. In *Mitchell v. DeMario Jewelry,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960)—the sole example of intertwining cited by *Terry*— the Court found that § 17 of the Fair Labor Standards Act, 29 U.S.C. § 217, which gave the district courts explicit power to enjoin certain retaliatory discharges, implicitly also gave them power to award whatever supplementary relief was necessary to further the purposes of the statute, including lost wages. The Court characterized this implied power as equitable, not because lost-wage relief inherently sounds in equity, but rather because it arose derivatively from the equitable injunction powers granted by the statute. *Id.* 361 U.S. at 291–93, 80 S.Ct. at 334–36.

Title VII, at least before its amendment by Civil Rights Act of 1991, is likewise a statutory scheme under which back pay is merely incidental to equitable relief. See *Sparrow v. Commissioner,* 949 F.2d 434, 437–38 (D.C.Cir.1991) (collecting cases). The text of Title VII itself subordinates the granting of back pay to an award of reinstatement, which in turn is merely a manifestation of the statute's grant of injunctive powers and derivative equity jurisdiction:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, *the court may enjoin* the respondent from engaging in such unlawful employment practice, *and order such affirmative action as may be appropriate,* which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., *or any other equitable relief* as the court deems appropriate.

42 U.S.C. § 2000e–5(g)(1) (emphasis added). See *Terry,* 494 U.S. at 572, 110 S.Ct. at 1348–49 (citing this language to justify assumption that Title VII backpay claims are equitable and to distinguish those claims from rights of action implied from the NLRA); *Curtis,* 415 U.S. at 197, 94 S.Ct. at 1010 (1974) (contrasting this language with Title VIII's simple authorization of damages and holding that equitable nature of Title VII relief should not control characterization of Title VIII remedies). Further, the characterization of Title VII backpay awards as equitable is bolstered by the fact that judges formally retain some degree of equitable discretion in deciding whether to award back pay in individual cases once violations are proven, see *Lorillard v. Pons,* 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978); *Curtis,* 415 U.S. at 197, 94 S.Ct. at 1010, even though the Court has severely constrained the exercise of this discretion, see *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).

---

**3.** Crocker argues that his original demand for instatement is now moot because he is nearly 70 years old, while Piedmont insists that Crocker's prayer for instatement was the essence of his complaint, back pay being computed secondarily from the point of instatement.

On the other hand, where a statute does not explicitly describe money damages as equitable, or where the imposition of such damages is not a matter of equitable discretion once a defendant's violation is proven, the Court has characterized the relief as legal and required a jury trial. See *Lorillard,* 434 U.S. at 584, 98 S.Ct. at 872 (noting that the ADEA "incorporates the FLSA provision that employers 'shall be liable' [for wage deficiencies], while under Title VII, the availability of backpay is a matter of equitable discretion"; jury trial therefore available); *Curtis,* 415 U.S. at 197, 94 S.Ct. at 1010 (holding jury trial available for Title VIII money damages claim; "There is no comparable discretion here: if a plaintiff proves unlawful discrimination and actual damages, he is entitled to judgment for that amount."). Similarly, where the power to award money damages is not merely derivative of the court's authority to enjoin statutory violations but rests on a "separate and distinct statutory provision," the award of damages will not be considered "incidental to or intertwined with" equitable relief. *Tull v. United States,* 481 U.S. at 425, 107 S.Ct. at 1839.

It may seem counterintuitive to determine the availability of a *constitutional* guarantee on the basis of such subtle intimations from *Congress.* But such an approach may be inevitable in a system of rules that attaches the jury right to novel causes of action created by Congress, see *Curtis,* 415 U.S. at 194, 94 S.Ct. at 1008, and yet allows Congress freely to extinguish these rights by assigning their adjudication to a non-judicial body, see, e.g., *Atlas Roofing Co. v. OSHRC,* 430 U.S. 442, 450, 97 S.Ct. 1261, 1266–67, 51 L.Ed.2d 464 (1977).

Here, of course, we have no statutory provision whatever creating the cause of action or identifying the available remedies. But the Supreme Court has made clear that even with respect to implied causes of action, courts are presumed to possess the full range of remedial powers—legal as well as equitable—unless Congress has expressly restricted their exercise. See *Franklin v. Gwinnett County Pub. Schools,* 503 U.S. 60, 70, 75–77, 112 S.Ct. 1028, 1035, 1038, 117 L.Ed.2d 208

(1992). Although *Franklin* does not address the issue of jury trial, the inference that Congress intended a full range of remedies for implied causes of action undercuts any assertion of a statutory basis for viewing the court's power to award back pay as merely "incidental to or intertwined with" its ability to grant equitable relief. Finally, we note that *Terry* itself found a jury right for a purely implied cause of action for back pay. 494 U.S. at 563, 110 S.Ct. at 1343–44.

Given that neither of *Terry*'s two exceptions applies, we hold that Crocker's prayer for back pay is a request for legal money damages and not equitable relief. Crocker was therefore entitled to a jury trial on his claim, and the district court was wrong to strike his jury demand. We now determine whether this error was harmless or whether a new trial is required.

## C. *Was the Failure To Give a Jury Trial Prejudicial?*

Given the importance of the constitutional right to a jury trial, we will require a new trial when that right is erroneously withheld "except in the rare instances in which denial of a jury demonstrably was harmless error," 9 Wright, Miller & Cooper § 2322, at 175. Such error is harmless only when the party's case is so weak that if it *had* been tried before a jury, a directed verdict would have been appropriate—that is, when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party," Fed.R.Civ.P. 50(a)(1). See also *Partee v. Buch,* 28 F.3d 636, 639 (7th Cir.1994); *Pandazides v. Virginia Bd. of Educ.,* 13 F.3d 823, 827 (4th Cir.1994). Here, the evidence on Piedmont's side does not meet that test.

As noted above, Crocker asserted that Piedmont declined to hire him because of his age, while Piedmont contended that it rejected him simply through application of a general policy against hiring pilots who had ever been suspended by the Federal Aviation Administration for 30 days or more, a policy that if regularly applied would be an adequate defense. See 29 CFR §§ 220.11(a), 220.21(a) (allowing carriers to set some employment requirements and limiting first-hire rights to applicants who meet all legitimate

qualifications). The district court accepted Piedmont's defense, finding that the airline had a "consistent practice" of refusing to hire applicants whose flying licenses had been suspended for 30 days or more. But the evidence of such a policy was hardly conclusive, consisting largely of the following colloquy with Captain Sharp, the official who had conducted Piedmont's initial interview of Crocker in July 1982:

Q: Has Piedmont, in your recollection, in its history ever hired a pilot applicant who had his license suspended by the FAA for thirty days?

A: Not to my knowledge.

Sharp testified that at the interview he had asked Crocker to explain his suspension, which Crocker had listed on his application for employment. Sharp said he was disturbed by both the substance of Crocker's violations of FAA safety rules and his defiant and cavalier attitude towards the suspension.

Crocker contradicted the suggestion that he was automatically disqualified from consideration. He and his wife testified that he had been encouraged after the interview to take an additional required flight engineers' exam and that he had repeated contact with Piedmont in the months following and received word each time that his application was still under consideration. He notes that despite his imperfect safety record, Sharp gave him the same numerical ratings during the interview as he did some other candidates who were hired. In addition, Crocker presented more than a mere "scintilla" of evidence suggesting that his age, and not his safety record, was responsible for his not being hired, *Harbor Ins. Co. v. Schnabel*, 946 F.2d 930, 935 (D.C.Cir.1991): he introduced a letter from the airline stating that it had a preference for pilot applicants between 24 and 32 years old, he elicited on cross-examination that Sharp had written down the ages of all applicants during their interviews, and he demonstrated that at the time of his interview he was nine years older than the oldest hired candidate. Regardless of whether Crocker could have affirmatively proved a full age-discrimination claim on this evidence, we do think that he cast enough doubt on Piedmont's claimed reason for failing to hire him that a reasonable jury could have found in his favor. We therefore find that the district court's erroneous refusal of a jury trial was prejudicial error and that a retrial is required.

\* \* \*

We find that Crocker was entitled to a jury trial on his claims, that the striking of his jury demand was prejudicial error, and that his suit was not time-barred. We therefore affirm the district court's 1988 ruling on the applicable statute of limitations, vacate the orders striking the demand for a jury trial and entering judgment for Piedmont after the bench trial, and remand the case to the district court for further proceedings.

*So ordered.*