**17-3927**
*Bifolck v. Philip Morris*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————

August Term 2018

(Argued: January 31, 2019 | Decided: August 22, 2019)

Docket No. 17-3927

VINCENT J. BIFOLCK, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE
OF JEANETTE D. BIFOLCK,

*Plaintiff-Appellant*,

v.

PHILIP MORRIS USA INC.,

*Defendant-Appellee*.[*]

———————

Before:
> CALABRESI, CABRANES, AND WESLEY, *Circuit Judges*.

Plaintiff-Appellant Vincent Bifolck, individually and as executor of the estate of his deceased wife Jeanette Bifolck, appeals from a judgment of the United States District Court for the District of Connecticut (Underhill, *J.*) entered at the conclusion of a jury trial. In 2006, Bifolck sued Defendant-Appellee Philip Morris USA Inc. under the Connecticut Product Liability Act, alleging that the company's Marlboro and Marlboro Lights cigarettes were negligently designed and caused his wife's death. Before trial, Bifolck moved to give preclusive effect to certain

---

[*] The Clerk of the Court is directed to amend the caption as set forth above.

factual findings made in a civil Racketeer Influenced and Corrupt Organizations Act case against Philip Morris and other major cigarette manufacturers before the United States District Court for the District of Columbia. The court denied Bifolck's motion. After a two-week trial, a jury found for Philip Morris. Bifolck argues on appeal that the district court misapplied the nonmutual offensive collateral estoppel standard. We agree. But, in the circumstances presented here, the district court's error does not necessarily require vacatur of the judgment. Accordingly, we **REMAND** the case and direct the district court to consider whether the application of nonmutual offensive collateral estoppel would be unfair. The judgment stands pending the outcome of these proceedings and, if requested by the parties, any further appellate review.

————————————

DAVID S. GOLUB (Jonathan M. Levine, *on the brief*), Silver Golub & Teitell LLP, Stamford, CT, *for Plaintiff-Appellant*.

GEOFFREY J. MICHAEL, Arnold & Porter Kaye Scholer LLP, Washington, D.C. (David E. Kouba, Arnold & Porter Kaye Scholer LLP, Washington, DC; Paul W. Rodney, Arnold & Porter Kaye Scholer LLP, Denver, CO; Frank P. Kelly, Shook, Hardy & Bacon LLP, San Francisco, CA; Scott D. Kaiser, Ruth Anne French-Hodson, Shook, Hardy & Bacon LLP, Kansas City, MO; Francis H. Morrison, III, Axinn Veltrop & Harkrider LLP, Hartford, CT, *on the brief*), *for Defendant-Appellee*.

————————————

WESLEY, *Circuit Judge*:

Vincent Bifolck, individually and as executor of the estate of his deceased wife Jeanette Bifolck, appeals from a judgment of the United States District Court for the District of Connecticut (Underhill, *J.*) entered at the conclusion of a jury trial. Bifolck sued Philip Morris USA Inc. under the Connecticut Product Liability

Act ("CPLA"), alleging that its Marlboro and Marlboro Lights cigarettes (collectively, "Marlboros") were negligently designed and caused his wife's lung cancer and subsequent death at the age of 42.

Before trial, Bifolck moved to apply nonmutual offensive collateral estoppel[1] to certain factual findings made in a civil Racketeer Influenced and Corrupt Organizations Act ("RICO") case against Philip Morris and other major cigarette manufacturers before the United States District Court for the District of Columbia. *See United States v. Philip Morris USA, Inc.* ("*DOJ*"), 449 F. Supp. 2d 1 (D.D.C. 2006). Bifolck sought to preclude six factual findings, including that Philip Morris "manipulated [its] cigarette design and composition to assure nicotine delivery levels which create and sustain addiction." Bifolck App. 252. The district court denied the motion, concluding that the issues to which Bifolck sought to give preclusive effect were not necessary to the judgment in *DOJ*, and that the issues in the two actions were not sufficiently identical. After a two-week trial, a jury found that Bifolck had failed to establish his claim.

---

[1] Nonmutual offensive collateral estoppel is a species of collateral estoppel (or "issue preclusion," as it is also known) that operates to "preclude a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff." *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005).

On appeal, Bifolck argues that the district court erroneously applied the standard for nonmutual offensive collateral estoppel. We agree. But, in the circumstances presented here, the district court's error does not necessarily require vacatur of the judgment. Accordingly, we remand the case and direct the district court to consider whether the application of nonmutual offensive collateral estoppel would be unfair—a question that it expressly declined to reach. The judgment stands pending the outcome of these proceedings and, if requested by the parties, any further appellate review.

## BACKGROUND

Jeanette Bifolck began smoking Marlboros in the early 1970s and stopped shortly before her death from lung cancer in 2000. In 2006, Vincent Bifolck filed this lawsuit, alleging that the "toxic ingredients" in Marlboros caused his wife's cancer and death. Bifolck App. 78. Relying on the CPLA, Conn. Gen. Stat. §§ 52-572m *et seq.*, Bifolck sought compensatory and punitive damages, arguing that Philip Morris "had the ability to design and manufacture" its cigarettes with reduced levels of nicotine and carcinogens, but negligently and "purposefully designed and sold its cigarette products to deliver a pharmacologically effective dose of nicotine in order to create and sustain nicotine addiction in its consumer

4

smokers." *Id.* at 79–80. He also alleged that Philip Morris "falsely den[ied] that it manipulated the nicotine in [Marlboros]." *Id.* at 82. This, Bifolck argued, made Marlboros "defective and unreasonably dangerous" under the CPLA. *Id.* at 83.

Three weeks before trial, Bifolck moved to give preclusive effect to certain findings made in *DOJ*. That case began many years before, when the U.S. Department of Justice brought a civil RICO action against several major cigarette manufacturers, including Philip Morris. *DOJ*, 449 F. Supp. 2d at 26. In August 2006, after a nine-month bench trial, the district court found that the defendants, including Philip Morris, violated RICO. *Id.* at 851, 901. As part of the remedy, the court ordered Philip Morris to make several "corrective statements"[2] to major media outlets, including that[3]:

> Philip Morris USA intentionally designed cigarettes to make them more addictive. Cigarette companies control the impact and delivery of nicotine in many ways, including designing filters and selecting cigarette paper to maximize the ingestion of nicotine, adding

---

[2] The United States Court of Appeals for the District of Columbia Circuit upheld the corrective statements with minor adjustments. *See United States v. Philip Morris USA Inc.*, 801 F.3d 250, 263 (D.C. Cir. 2015).

[3] Because of various appeals, the language of the corrective statements was not finalized until June 27, 2017. *See United States v. Philip Morris USA Inc.*, 257 F. Supp. 3d 1 (D.D.C. 2017). Philip Morris began publishing its corrective statements in November of 2017, two weeks after the jury verdict in Bifolck's case.

ammonia to make the cigarette taste less harsh, and controlling the physical and chemical make-up of the tobacco blend.

*United States v. Philip Morris USA Inc.*, 257 F. Supp. 3d 1, 5 (D.D.C. 2017).

After the corrective statements had been finalized but before they were published, Bifolck moved to preclude Philip Morris from challenging at trial six factual findings made against Philip Morris in *DOJ*. As relevant here, he sought to preclude Philip Morris from challenging that "[b]oth before and during the time that Mrs. Bifolck smoked, Philip Morris manipulated cigarette design and composition to assure nicotine delivery levels which create and sustain addiction." Bifolck App. 252.

The district court denied Bifolck's motion. It concluded, first, that the issues to which he sought to give preclusive effect were not identical to the issues in this action. In its view, *DOJ*, a "massive," multi-defendant civil RICO case, differed materially from Bifolck's single-defendant, state product liability case. *Id.* at 605. The district court also determined that none of the findings to which Bifolck "[sought] to give preclusive effect . . . [were] necessary to the [c]ourt's ruling in [*DOJ*]." *Id.* It reasoned that the thousands of findings in *DOJ* made it "literally impossible" to determine which finding(s), if any, were *necessary* to the court's

judgment. *Id.* Finally, the court noted that if it "had to reach" the issue, it "probably would find that there are equitable considerations . . . that would make it inappropriate" to apply nonmutual offensive collateral estoppel. *Id.*

Trial commenced. Bifolck argued that, during the relevant period, Philip Morris's Marlboros were defective because they were unnecessarily carcinogenic and unnecessarily addictive. Philip Morris presented evidence that it did not manipulate nicotine yields in Marlboros to achieve an addictive level of nicotine. Richard Jupe, an employee of a Philip Morris affiliate whom Philip Morris called to provide expert testimony concerning cigarette design, testing, and manufacturing, testified that Philip Morris "[n]ever added nicotine" to its cigarettes between 1970 and 2000, and that the only nicotine in Marlboros was "naturally occurring in the leaf." *Id.* at 670. Jupe further testified that Philip Morris never studied the "minimum effective dose" necessary to create and sustain an addiction. *Id.* at 679. The court instructed the jury that it could find the design of Marlboros defective if it found "that the cigarettes were unreasonably dangerous because they were unnecessarily addictive . . . [or] unnecessarily carcinogenic." *Id.* at 681. The jury found that Bifolck failed to establish his claim.

On appeal, Bifolck challenges the district court's pretrial ruling with respect to one finding to which he sought to give preclusive effect: that Philip Morris "deceiv[ed] consumers into becoming or staying addicted to cigarettes by manipulating the design of cigarettes and the delivery of nicotine to smokers, while at the same time denying that they engaged in such efforts."[4] *DOJ*, 449 F. Supp. 2d at 852.

**DISCUSSION**

Nonmutual offensive collateral estoppel, a form of issue preclusion, "preclude[s] a defendant from relitigating an issue the defendant has previously litigated and lost to another plaintiff." *Faulkner*, 409 F.3d at 37 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)). To invoke this doctrine, a plaintiff must satisfy four conditions:

---

[4] As previously noted, before trial, Bifolck sought to preclude Philip Morris from contesting that, "[b]oth before and during the time that Mrs. Bifolck smoked, Philip Morris manipulated cigarette design and composition to assure nicotine delivery levels which create and sustain addiction." Bifolck App. 252. One key difference between this formulation and the one Bifolck advances on appeal is the applicable temporal period. As we observe below, the factual findings in *DOJ* are not sufficiently specific to preclude Philip Morris from contesting that it manipulated nicotine levels in Marlboros during the period relevant to this action. Accordingly, we adopt the formulation of the issue as set forth in Bifolck's motion but without the time frame specified therein—*i.e.*, "Philip Morris manipulated cigarette design and composition to assure nicotine delivery levels which create and sustain addiction." *Id.*

8

(1) the issues in both proceedings must be identical,

(2) the issue in the prior proceeding must have been actually litigated and actually decided,

(3) there must have been a full and fair opportunity for litigation in the prior proceeding, and

(4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Id.* (quotation marks and citation omitted). Additionally, in order to blunt the fear that nonmutual offensive collateral estoppel may be unfair to a defendant or fail to promote judicial economy, district courts must ensure that application of the doctrine is not unfair. *See Parklane Hosiery*, 439 U.S. at 331 ("[W]here . . . the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow [it].").

## A. Standard of Review

There has been some confusion about the proper standard to be used in reviewing a district court's nonmutual offensive collateral estoppel determination. This Court has previously suggested that it reviews the issue *de novo*. *See SEC v. Monarch Funding Corp.*, 192 F.3d 295, 303 (2d Cir. 1999). But, relying on the Supreme Court's guidance in *Parklane Hosiery*, we have also been careful to note

that a "district court is generally accorded wide discretion to determine when offensive collateral estoppel should be applied." *See Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995) (citing *Parklane Hosiery*, 439 U.S. at 331).

*Monarch Funding* and *Remington Rand* focused on the correct standard for a particular aspect of collateral estoppel but failed to articulate how the standards operate together. Other courts have similarly struggled to apply these standards.[5] In practice, the standards fit together nicely. We review the district court's analysis of the four-prong legal test *de novo*. *See Faulkner*, 409 F.3d at 34. The district court's fairness analysis—*i.e.*, its determination, after finding that the four-prong legal test is satisfied, that the *application* of nonmutual offensive collateral estoppel is either

---

[5] The Third and Eighth Circuits, for instance, read *Parklane Hosiery*'s language broadly. *See, e.g.*, *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) ("[I]t is undoubtedly appropriate to review for abuse of discretion" a district court's "determin[ation whether] to apply non-mutual offensive collateral estoppel."); *Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension Fund*, 85 F.3d 1374, 1376 (8th Cir. 1996) (same). As we do here, the Sixth and Ninth Circuits apply both standards. *See, e.g.*, *United States v. Sandoz Pharm. Corp.*, 894 F.2d 825, 826 (6th Cir. 1990) ("The availability of collateral estoppel is a mixed question of law and fact which we review *de novo*. However, once it is established that the elements of collateral estoppel are present, a district court has broad discretion to determine when the doctrine should be applied offensively." (citation omitted)); *Plaine v. McCabe*, 797 F.2d 713, 718 (9th Cir. 1986) (same).

*fair or unfair*—is reviewed for abuse of discretion. *See Remington Rand Corp.*, 68 F.3d at 1486.

Here, the district court premised its decision not to apply nonmutual offensive collateral estoppel on the first and fourth prongs of the legal analysis. Accordingly, we review its decision *de novo*.[6]

### B. Identicality

The first prong requires that the issue decided in the earlier case and the issue to which the plaintiff seeks to give preclusive effect be identical. *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013). It is concerned not with "claims or . . . causes of action as a whole," *id.*, but with *issues*—"single, certain and material point[s] arising out of the allegations and contentions of the parties," *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 48 (2d Cir. 2014) (citation omitted). Where, as here, the issue to which the plaintiff seeks to give preclusive effect concerns "only the existence or non-existence of certain facts," and not "the legal significance of

---

[6] The district court's decision provides no clues concerning its view with respect to whether the second and third prongs of the analysis are satisfied. In light of Philip Morris's failure to contest these issues, we conclude that it has waived its ability to do so. We therefore assume that Bifolck has established the second and third prongs and limit our analysis to the first and fourth prongs.

those facts . . . , [it] need only deal with the same past events [as the previously-decided issue] to be considered identical." *Id.* (citation omitted). In such cases, the "legal standards to be applied" need not be identical.[7] *Id.* (citation omitted). For example, in *Matusick*, we distinguished between a hearing officer's ultimate conclusion that Matusick committed disciplinable misconduct, which was "guided by [a] particular legal framework," from "[t]he *factual* findings supporting [this conclusion] . . . *i.e.*, that [Matusick] had failed to respond to calls and slept on duty." *Id.* at 49.

To determine whether the issues are identical, we begin by restating the issue to which Bifolck seeks to give preclusive effect: that "Philip Morris manipulated cigarette design and composition to assure nicotine delivery levels which create and sustain addiction." Bifolck App. 252. Several factual findings from *DOJ* touch on this issue. For example, the court in *DOJ* found that Philip

---

[7] Philip Morris argues that identicality can exist only if the controlling facts *and* law are consistent between the first and second suit. *See, e.g., Faulkner*, 409 F.3d at 37 (requiring that the "controlling facts and applicable legal rules remain unchanged" (quoting *Comm'r of Internal Revenue v. Sunnen*, 333 U.S. 591, 599–600 (1948))). This misconstrues the standard. *Faulkner* and *Sunnen* concerned the application of collateral estoppel where the "legal atmosphere" was "vitally altered between the time of the first judgment and the second." *See Sunnen*, 333 U.S. at 600. Because neither party alleges a change in law (to RICO, the CPLA, or otherwise), this point is irrelevant to our analysis here.

Morris "Researched, Developed, and Utilized Various Designs and Methods of Nicotine Control to Ensure that All [its] Cigarettes Delivered Doses of Nicotine Adequate to Create and Sustain Addiction," *DOJ*, 449 F. Supp. 2d at 337 at heading 2, and that Philip Morris "understood that its market position . . . required the development of cigarettes that provide nicotine in amounts sufficient to ensure that smokers become and remain addicted" and, therefore, "took steps, over a sustained period of time, to develop such cigarettes," *id.* at 334 ¶ 1493.[8] On its face, therefore, the issue to which Bifolck sought to give preclusive effect is identical to a "certain and material point" that was decided in *DOJ*. *See Matusick*, 757 F.3d at 48 (citation omitted).

Philip Morris argues that the issues are not identical because the instant case involves a narrower issue: that Philip Morris manipulated cigarette design and composition of *Marlboros* between the *1970s and 2000*. And the more general fact that Philip Morris manipulated nicotine levels, it contends, is irrelevant to Bifolck's

---

[8] *See also id.* at 311 ¶ 1380 ("Philip Morris ha[d] been aware of the need to effectively . . . control the amount of nicotine in cigarettes since as early as the 1940s."); *id.* at 341 ¶ 1526 ("Philip Morris ha[d] been altering the blend of its tobacco filler to obtain desired levels of nicotine since at least 1954."); *id.* at 341 ¶ 1528 ("By 1960, Philip Morris was studying the effects of adding nicotine maleate to blended leaf tobacco to determine if the nicotine content of cigarettes could be increased.").

claims. It is true that *DOJ* implicated more than fifty years of alleged misconduct involving multiple defendants and dozens of cigarette brands, and that the factual findings at issue here were not made at such a level of specificity as to implicate Marlboros or the time period during which Jeanette Bifolck smoked. Because the factual findings from *DOJ* do not clearly state whether they implicate Marlboros during the operative period, we agree that the findings cannot be used to preclude Philip Morris from contesting this issue.

We do not agree, however, that Bifolck sought to give preclusive effect to this narrow issue, and we believe the more general issue is relevant to Bifolck's claims. As we understand it, Bifolck's motion requested that the district court give preclusive effect to a general factual finding about Philip Morris's knowledge and corporate practices. This general finding supported Bifolck's theory at trial, including his claim that Philip Morris "had the ability to make [its] cigarettes . . . safer by" reducing "the nicotine to nonaddictive levels." Bifolck App. 607; *see* discussion *infra* Section D & E.

To the extent Philip Morris contends that the identicality prong requires that the issue to which a plaintiff seeks to give preclusive effect be identical to an issue the plaintiff must ultimately prove at trial, Philip Morris is mistaken on the law. It

14

suffices that the issue decided in the prior proceeding is identical to the issue *as to which preclusion is sought*. *See Matusick*, 757 F.3d at 49 (concluding that the district court should have given preclusive effect to certain factual findings from the prior proceeding notwithstanding that those findings did not, without more, resolve an ultimate issue at trial).

We also disagree with the district court's conclusion that the issues are not identical because the *scope of the two cases* and the *causes of action* asserted therein are different. *See* Bifolck App. 605 ("Here we've got RICO, and we've got Connecticut product liability, so they're not identical."). As we have previously observed, the identicality standard does not require either that the two cases have the same scope or that they involve the same causes of action. *Proctor*, 715 F.3d at 414. Rather, it is met, as here, so long as the *issues* are identical. Whether differences in scope and causes of action make the application of nonmutual offensive collateral estoppel *unfair* is an important, but separate, determination, and one that is analyzed as part of the fairness inquiry.

In sum, we find the first prong—issue identicality—satisfied.

## C. Necessity

The fourth prong of the nonmutual offensive collateral estoppel analysis requires that the issue to which the plaintiff seeks to give preclusive effect "have been necessary to support a valid and final judgment on the merits" in the earlier case. *Faulkner*, 409 F.3d at 37. An issue is "necessary or essential only when the *final outcome* hinges on it." *Bobby v. Bies*, 556 U.S. 825, 835 (2009) (emphasis added). This requirement "'protect[s]' against unfairness[] by ensuring that the issue [was] 'really disputed and that the loser . . . put out his best efforts.'" *Monarch Funding Corp.*, 192 F.3d at 307 (first alteration in original) (quoting *The Evergreens v. Nunan*, 141 F.2d 927, 929 (2d Cir. 1944)); *see also United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999) (explaining that when an issue was unnecessary to a judgment, the parties may have had "limited incentive to litigate [it] fully," and it may have been "less likely to receive close judicial attention" (citation omitted)).

The conclusion in *DOJ* that Philip Morris violated RICO did not turn on any of the factual findings to which Bifolck sought to give preclusive effect. A plaintiff suing under civil RICO must prove two or more racketeering acts, or "predicates," to establish liability. *See* 18 U.S.C. §§ 1961(5), 1962. The Department of Justice alleged 148 predicates in *DOJ*, only some of which involved Philip Morris and

nicotine manipulation. *See DOJ*, 449 F. Supp. 2d at 959–86. We therefore agree with the district court that it is virtually impossible to determine which, if any, factual findings were necessary to the finding of liability.

But this is not the end of the matter. Bifolck argues that the judgment also includes the *remedy imposed*, namely, that Philip Morris make a nearly identical corrective statement to the media. We agree.

The necessity requirement is met where, as here, the issue is essential to the remedy imposed, even if the issue is not essential to a finding of liability. Courts have long considered the right to recover and its remedy to be integral components of the outcome of a case. *See Marbury v. Madison*, 5 U.S. 137, 147 (1803) ("It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress." (citing 3 William Blackstone, Commentaries *109)). As with the issue of liability, parties have a powerful incentive to fully litigate a remedy. *See Hussein*, 178 F.3d at 129. A remedy is, therefore, part of the "final outcome" of a case and is necessary to its judgment. *Bobby*, 556 U.S. at 835.

Here, the remedy imposed in *DOJ* includes a requirement that Philip Morris issue a corrective statement concerning, among other matters, its practices with

respect to nicotine manipulation. *See Philip Morris USA Inc.*, 257 F. Supp. 3d at 2, 5. The corrective statement is directly supported by, and dependent upon, at least some of the factual findings in *DOJ*. *Compare id.*, 257 F. Supp. 3d at 5 (ordering Philip Morris to state to major media outlets that "Philip Morris USA intentionally designed cigarettes to make them more addictive. Cigarette companies control the impact and delivery of nicotine in many ways, including designing filters and selecting cigarette paper to maximize the ingestion of nicotine, adding ammonia to make the cigarette taste less harsh, and controlling the physical and chemical make-up of the tobacco blend"), *with, e.g.*, *DOJ*, 449 F. Supp. 2d at 337 at heading 2 (finding that Philip Morris "Researched, Developed, and Utilized Various Designs and Methods of Nicotine Control to Ensure that All [its] Cigarettes Delivered Doses of Nicotine Adequate to Create and Sustain Addiction"). And Philip Morris has litigated the corrective statements for more than a decade at both the trial and appellate levels. There is thus little doubt that it "put out [its] best efforts," *Monarch Funding Corp.*, 192 F.3d at 307 (quotation marks and citation omitted), and that the corrective statements received "close judicial attention," *Hussein*, 178 F.3d at 129.

Accordingly, we conclude that the finding to which Bifolck sought to give preclusive effect was necessary to the remedy imposed by the court in *DOJ*, and therefore necessary to the judgment.

Philip Morris also argues that Bifolck's claim fails because the corrective statement was not explicitly tied to any specific factual finding(s). In other words, the factual findings in *DOJ* were not necessary to the judgment in that case because there was no indication that the corrective statement ordered by the court in *DOJ* "hinge[d]" on them. *Bobby*, 556 U.S. at 835. We disagree. Limiting nonmutual offensive collateral estoppel only to the specific findings on which *liability* turned would unnecessarily prevent its application in complex cases where liability turns on a multitude of facts. As we note above, we have concluded that the corrective statement concerning Philip Morris's nicotine manipulation practices is directly supported by the finding to which Bifolck sought to give preclusive effect. Whether the scope or complexity of the case would make preclusion unfair is a separate question, and one that the district court is well positioned on remand to consider as part of its fairness analysis.

For these reasons, the necessity requirement is satisfied.

### D. Fairness Analysis

Even if a court concludes that all four prongs of the nonmutual offensive collateral estoppel analysis have been established, it must still assure itself that it is fair to apply the doctrine. *See Parklane Hosiery*, 439 U.S. at 331. This final inquiry reflects judicial wariness of nonmutual offensive collateral estoppel. *See, e.g., id.* at 329 (finding that the "offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does"); *Jack Faucett Assocs. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 124 (D.C. Cir. 1984) (recognizing that the offensive collateral estoppel doctrine is "detailed, difficult, and potentially dangerous"). We have not exhaustively catalogued the factors a district court should consider when reviewing for fairness, and we decline to do so now. We note, however, several factors that courts have considered.

*Parklane Hosiery* suggests courts look to whether "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," 439 U.S. at 330, and whether "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result," *id.* at 331. Other factors include whether the "the defendant had little to no incentive to raise [the issue] in the

earlier action," *Marcel Fashions Grp. v. Lucky Brand Dungarees, Inc.*, 898 F.3d 232, 240 (2d Cir. 2018), and whether the underlying case was tried before a jury or a judge sitting as trier of fact, *see Monarch Funding Corp.*, 192 F.3d at 304. District courts may also take into account the relative scope or complexity of the two actions and whether they involve different causes of action.

One fairness consideration weighs particularly heavy here: whether applying collateral estoppel would have increased the efficiency of the proceedings. *See id.* at 305. The issue that Bifolck sought to establish: "Philip Morris manipulated cigarette design and composition to assure nicotine delivery levels which create and sustain addiction," Bifolck App. 252, is no silver bullet. As discussed above, Bifolck's formulation of the issue makes no mention of Marlboros or the time period during which Jeanette Bifolck smoked—nor could it, since those issues were not decided in *DOJ*. Philip Morris argues on appeal that giving this finding preclusive effect would not have conserved judicial resources and would have confused the jury. Bifolck argues that precluding the relitigation of findings from *DOJ* would have increased efficiency and streamlined the proceedings.

Nonmutual offensive collateral estoppel could have failed to increase efficiency in several ways: by confusing the jury on the differences between what

21

was decided in *DOJ* and what Bifolck ultimately needed to prove, by causing the production of duplicative evidence, or because the general nature of the preclusion may be too inconsequential to Bifolck's case.[9] On the other hand, a baseline factual finding about nicotine manipulation could have increased efficiency by shortening and focusing the expert testimony and streamlining jury deliberation.

This is a close question and one we need not answer on appeal. The district court said that if it "had to reach" the issue, it "probably would find that there are equitable considerations . . . that would make it inappropriate" to apply nonmutual offensive collateral estoppel. Bifolck App. 605. It is not clear, however, on what factors the district court was relying or if it would maintain this view on remand during a full analysis of the fairness considerations. We accordingly remand for the court to review, in its sound judgment, whether application of nonmutual offensive collateral estoppel would be unfair.

---

[9] In addition, Bifolck filed his motion to give preclusive effect just a few weeks before trial. As part of its fairness analysis, the district court is well suited to determine whether the timing of the motion counsels against applying nonmutual offensive collateral estoppel.

### E.  The Error Was Not Harmless

Philip Morris's final argument is that, even if we find error, we should nevertheless affirm the judgment of the district court because any such error was harmless. We are not persuaded.

Courts should ignore errors that "do not affect the substantial rights of the parties," 28 U.S.C. § 2111, or the "essential fairness of the trial," *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984). *See also Bonner v. Guccione*, 178 F.3d 581, 592 (2d Cir. 1999) ("[I]f . . . the conviction is such that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." (quotation marks and citation omitted)).

The error here was not harmless. Whether "Philip Morris manipulated cigarette design and composition to assure nicotine delivery levels which create and sustain addiction," Bifolck App. 252, was important to Bifolck's case. At trial and during jury deliberations, Bifolck could have benefitted from a stipulation of this fact. As noted above, the jury was instructed that it could find the cigarettes "unreasonably dangerous" if it found them to be "unnecessarily addictive."[10] *Id.*

---

[10] The jury was instructed that:

at 681. This finding could have demonstrated, for example, that Philip Morris knew that it could manipulate nicotine levels, thus supporting the conclusion that it made Marlboros "unnecessarily addictive" by virtue of a *design choice* not to lower nicotine levels and, therefore, made them "unnecessarily dangerous" under the CPLA. *Id.* Bifolck sought to elicit this testimony from Jupe, Philip Morris's expert, who instead made claims inconsistent with the findings in *DOJ*, painting a cloudy picture of what the company could or could not do and did or did not know. *See, e.g., id.* at 679–80. These issues implicate important aspects of Bifolck's claim. Had he built his case with a baseline finding that Philip Morris could (and, at times, did) manipulate nicotine levels, Bifolck's whole strategy at trial could have been different.

---

> Mr. Bifolck alleges [that] the design of Marlboro and Marlboro Light cigarettes was defective in two respects: One, that the cigarettes were unreasonably dangerous because they were unnecessarily addictive and, two, that the cigarettes were unreasonably dangerous because they were unnecessarily carcinogenic. . . .
>
> In determining whether the product was unreasonably dangerous, you may consider things such as the state of scientific and technical knowledge at the time. You may consider whether the product was inherently dangerous and, if so, whether the risks of using the product could be reduced without destroying the utility of the product.

Bifolck App. 681.

While the district court may ultimately find that it would be unfair to apply nonmutual offensive collateral estoppel on these facts, the error in applying the first and fourth prongs was not harmless.

## CONCLUSION

For the foregoing reasons, we **REMAND** the case, but do not vacate the judgment, and direct the district court to consider whether it would be unfair to apply nonmutual offensive collateral estoppel. The judgment stands pending the outcome of these proceedings and, if requested by the parties, any further appellate review.